May it please the Court. My name is Kenneth Green. I represent the appellant Neighbors Offshore Corporation. Neighbors appeals the lower court's decisions, in this case, that only approximately 897,000 of Neighbors approximately $6.9 million allowed liquidated claim was entitled to administrative priority. There is no dispute with respect to the allowed amount of Neighbors claim, $6.9 million. There is also no dispute because the parties stipulated at trial that all of the services that were reflected in the IADC form daily drilling reports were actually performed by Neighbors, in this case, for Whistler. And the reports themselves are reviewed and signed each day by Whistler's representative. It would be very easy if after they reject the contract you'd said we need some agreement as to why we're staying on this platform. So their response as I read it, maybe I'm oversimplifying, is instead they sent a letter saying take your cranes off. They sent a letter, the letter the Court's referring to is the July 25, 2016 letter. The letter, it's characterized by Whistler as a demand that Neighbors remove their equipment. But if you look closely, what it actually is is a request for a demobilization plan. And it's significant that that is different, in fact, than a demand that Neighbors remove its equipment. It's significant for two primary reasons. One, there's no dispute that Whistler needed Neighbors' cranes and crane operator until it could secure a replacement. Neighbors or Whistler was also using Neighbors' living quarters. Neighbors was providing the electricity to power those living quarters. I'm going to interrupt you and say, why would we reverse if it's your burden to prove entitlement to the priority? Judge Brown has a four-day hearing, and then he does reimburse you for the cranes and the quarters. It looks like he did his best to particularize. And what's most attractive to your argument and concerns me is did he make a legal error? If so, I need to start with what is the rule of law that's appropriate? Are you saying if you stayed without a request and it wasn't used, you're still entitled to it because you were sitting there? I don't think you're saying that. Or are you saying regardless of request, if they utilized your services, you get a priority? That's it. I'm saying the second thing exactly. And you're saying that he said, and then it was compounded by the district court, that you only get it's easy to do what was requested for. Judge Brown and the district court Judge Malazzo said that's easy for us to do. This is what they requested. We'll give you only that, nothing more, not the generators. Do I have your argument right? Yes, you are correct. And the issue that we take with this finding or this additional requirement that you have to show a specific request, in addition to actual providing of services, actual use of services, you also have to show this specific request, is that that additional requirement does not comport with the Fifth Circuit standard. Quite frankly, it doesn't even comport with JARTRAN, the Seventh Circuit case that is cited as support for the public. This case is all about what's the scope of inducement. When a debtor in possession has need for something that a third party can offer, have they induced you to benefit the ongoing business, which clearly existed? They're making a ton of money, $2 million, whatever a month off oil. That's right. So what's your best case? You're going to tell us it's our own cases, I guess. What's the best description of what a debtor in possession does to therefore induce, hence you get your priority? The best Fifth Circuit case on this point is the trans-American natural gas case. Both that case and the Jack Wade case are both cited by the lower courts. Factually, trans-American is more similar because it involved a creditor who was providing casing for the drilling of oil wells, which is more factually similar to the broad scope of services that neighbors was providing in this case. Another similarity is that you had a debtor in trans-American that raised an offset claim. Whistler raised an offset claim in this case. The bankruptcy court rejected that, and that's not on appeal. But there the court was considering benefit. So under the Fifth Circuit standard, you have three things. The claim must arise post-petition. To me, that's no question that's satisfied here. In fact, it's the rejection of the contract that eliminates any doubt because you don't say, well, or the next issue. As a result of actions taken by the debtor in possession, you asked, should, in a perfect world, would you have gotten a separate agreement that spelled out post-rejection, we are going to do 1, 2, 3, 4, in a perfect world. But what we do have, and it's stipulated, undisputed, daily drilling reports that reflect each morning neighbors and Whistler met, identified a scope of work for that day. The work is performed. Neighbors then delivers a report to Whistler. Here's all the work we did. And if you look at those reports, which are Trial Exhibit 9, you'll see each one of them will say we were working as directed by the operator. And then it provides a summary of the task. And most importantly, Whistler signed those each day confirming we asked neighbors to do this work and they did it. So I think that's the functional equivalent of perhaps even more persuasive than an agreement that would have been entered into in advance that might not have contemplated all the work that needed to be done. Here you have contemporaneous each day. The work is requested. It's performed. It's signed off on by Whistler. Now, the third requirement under Transamerican is benefits to the estate. So that's the Fifth Circuit standard. Now, JARTRAN that talks about inducement, the Enron case at the bankruptcy court sites from the Southern District of New York, those are really just refinements on the broader Fifth Circuit standard of benefit to the estate. So what we needed to show under the Fifth Circuit standard was benefit to the estate. The benefit in this case was derived by the fact that Whistler chose to keep neighbors' equipment on its platform for four months after it rejected the contract. And we know that Whistler controlled the timing of that because it's undisputed that that demobilization could not commence until Whistler did three things. Number one, and most importantly, they had to receive a waiver from Bessie of the requirement that production is shut in during demobilization. Otherwise, they're shut in for two months. They lose $4 million of revenue. So that was the main, most important thing they were waiting on. But they also needed a release from the preservation order. That happened on October 4th. And they needed to, operationally, they needed to remove their bay right, which is similar to a drilling mud, from certain of the equipment before you could demobilize it. So you had two regulatory issues, one operational issue. The production shut-in waiver was not even requested by Whistler until October 5th. It was received on October 20th. Demobilization commenced the same day. So Whistler controlled the timing of that. Whistler benefited from the services. And the services are really not separable. I know the bankruptcy court does that, but they're logically related. If you're providing living quarters, you need to provide the power for those living quarters. It's undisputed that the generators, the cost of the generators was not included? The cost of the generators was part of the day rate services. Right. But so when he did qualify you for the quarters, you're saying that to power the quarters required the generators and those weren't compensated? Right. And we know that for a fact because the one additional crane and the two additional quarters that are part of Whistler's Exhibit 66, which is what the bankruptcy court based its determination on, those were actually done under a July 2016 amendment to the drilling contract. So you can see they spelled out two quarters at $200 per day. That's $400. One additional crane at $1,200 per day. There's your $1,600. And that was separate from what was covered under the original drilling contract, the broader list of all the equipment that was being provided. I also want to point out right here, the district court made a finding that neighbors provided and Whistler accepted services that were more than just what the bankruptcy court based the administrative claim award on. So the bankruptcy court says, I'm going to limit this to only what's listed in Whistler's Trial Exhibit 66. They characterize it as only what Whistler requested. But if you actually go look at the testimony from Whistler's CEO, Robert Wichert, that's not even what he says. He says this is a summary of what we've decided we owe neighbors. But put that to the side. Even if the bankruptcy court was right that that's all that was requested, that's not the standard. The standard is whether we look at it under the more broad benefit analysis from TransAmerican or whether we use Jartran's inducement requirement where Jartran says actual use will satisfy inducement. Here you have actual use. You have the district court making a finding that there was actual use, yet still saying, but I'm going to affirm the bankruptcy court because the bankruptcy court made a finding as to, well, this was all that was specifically requested. And that becomes the real problem here. So under this framework, a creditor would have to show not only did I provide the work and not only did the debtor accept the work, but the debtor specifically requested each component of the services that I was providing. Well, counsel, let's say we do accept this argument and that the bankruptcy court, district court should have gone further. There still is the obligation that each individual item in your $6.9 billion claim have benefited the State. And I guess perhaps more of a question for the other side. If you win in part, does that mean you win in whole? Is there no distinction among your various claims? Are each of these things benefiting in the same way? Are there different categories of the remainder of your claims that were more related to the ongoing operations on the site as opposed to more related than other parts of your claim? Can you flesh that out before the other side takes a run at it? Let's start with the legal aspect, and TransAmerican is instructive on this case because TransAmerican says we don't have to identify the benefit in dollars and cents. So if what was required was that you had to compartmentalize each separate service and show a benefit in dollars and cents for each separate service, that would be problematic. But my point is that's not what TransAmerican requires. TransAmerican says the benefit can be established generally in terms of these are costs incident to the operation of the business, and that's what we have here. We have, and despite the ---- But if you don't, if what you did during all this period wasn't even being used, so you are essentially storing it inertly because you don't have some use land side for it, you couldn't include the cost of stuff that's just being stored and unused. Well, this is a good, I think, a good opportunity. If I could point the Court to the handout that's up there, which is the color photograph of the platform and the rig. And what you'll see here is that the neighbor's equipment essentially occupies this top half of the platform. So these items aren't severable, and you don't take one away simply because it's not being used. You're offshore. A version of the request of part or whole for me is once they all agree it's got to be demobilized, if you delayed or you moved slowly, that wouldn't be included. If neighbors ---- Yeah, if neighbors couldn't get their boat out there to get the crane, that wouldn't benefit the estate at all. I would agree with you on that. Okay. So where did Judge Brown make, he didn't reach that issue. He didn't reach the issue on demobilization. You really have to look at the two separate, the two components separate, the premobilization and the demobilization. What he found on the demobilization was, number one, Whistler did request it. But, two, there wasn't really a benefit to the estate because he says that's just a consequence of contract rejection. Our argument there is it's not the contractual obligation for demobilization that makes an administrative claim. It's the regulatory obligation under Section 250.1703 of the CFRs. That establishes the regulatory obligation to remove facilities when they're no longer useful for operations in case law, including the HLS case in the Fifth Circuit, Mid-Atlantic, other cases established that when a creditor performs that service, that's entitled to administrative priority. And one other issue I want to address has to do with this notion that this is really just a rejection damages claim. It's not. And that, quite frankly, is straightforward. If this were a rejection damages claim, what we would measure would be what was neighbors entitled to under the contract. So let me give you an analogy. If neighbors had a contract that was for two years, they were guaranteed payments totaling $1 million a year for two years, and Whistler rejected the contract and they were one year in, then you would say, well, the benefit of the bargain under that is $1 million, the second year that neighbors did not receive that revenue. Those are not the facts. This is an administrative claim based on use of services, not for amounts that were the benefit of the bargain under the contract. Unless the Court has any other questions, I'll save my time for rebuttal. Thank you. May it please the Court, Lewis and Phillips, on behalf of the appellee, appreciate the ability to be here before Your Honors. We'll point out that I have reverted to my 2-year-old self involuntarily through the affliction of an earache. So if I speak too loudly, it's because I can't hear how loudly I'm speaking. All I hear is myself rattling around in my brain. So I appreciate that. I apologize up front if it doesn't work out. Your Honors, we think that Your Honors have hit the salient points, and we have some disagreements about many, if not all, the salient points. Number one, we have a rejected contract. Number two, as Judge Brown found, we have availability, and we think that the demonstrative is very conveying of the fact that this rig and the cranes and the quarters that were sitting on top of our helipad were there after the contract was rejected. It's not like you could flip a switch and they could be gone. And I think the evidence established several things that have been missed by neighbors. Number one, neighbors asked for rejection. Whistler came in three days later and said, we agree to reject. The process is you have to have notice so the order wasn't entered until July. Some five to six days later, Whistler sent the letter that said, we want your rig off the platform. You need to give us a demobilization plan. Why? Because you have to demobilize a rig to get it off the platform. It's a multistage operation, and that occurred. It occurred over a long period of time. Judge Brown made a pivotal finding. We think that there was no inducement by Whistler that the rig and neighbor's equipment stay on the platform for as long as it did. He mentioned that there were discussions back and forth. Perhaps we can work out, as Judge Higginson said, an agreement post-rejection. That didn't work. There was pre-work about maybe a critical vendor. There could never be made a deal. Judge Brown found that. Wouldn't you think the debtor in possession then has to be really scrupulous to avoid any use? In other words, it's simply got to become like that pipeline, inert storage third party can't collect. But the minute the debtor in possession says, we'd love your generators to power up our quarters, they've got to pay for that incidental and overhead. Your Honor, let me point out a couple of things. Number one, I think the bankruptcy court made a finding weighing all of that. If we're talking about generators, that's one thing. But the evidence about generators showed, and we need to make clear about this, this platform had several producing wells that were powered by Whistler generators. Those wells preexisted Neighbors Rig being on the platform. So we have a generator that came in that was part of the overall day rate, but a very small part of the overall day rate because the day rate applied to the rig, to the big cranes, to the quarter. Well, the quarters were separately built. But the part of the day rate for the generators, the generators ran the rig, neighbors' property, and the quarters, neighbors' property. And so what I think the court was able to do was say that there are some services that are incidental to the fact that the rig is on the platform. And the generator is one of those. Neighbors' people stayed in those quarters. Those quarters were on our helipad. The helipad was not separately charged for. We couldn't use our helipad as long as it was on the top. The quarters were on top of our helipad. The generators ran Neighbors Rig, which it had to do so that neighbors could maintain its rig so that, as the testimony established, it would have a good rig to take off and put somewhere else. And the generators ran the quarters. The generators did not, as a matter of fact, run our platform or our production facilities. We had our own generators for that. The difficulty with accepting that is the district court's order then simplifies it down to I need a request. And even if that's blurred, then the district court three times says that's the easy way to do this. Only what's requested, and then, just to finish the thought, because it's a difficult point for me, you and your brief, it's not until footnote 86 that you try to deal with that sentence that Judge Malazzo put in about, in fact, materials and services were used that weren't paid for. And a footnote treatment of that is much more problematic because it looked like both judges here are saying we've got an easy way to do it. We'll just give priority. I think there's two different approaches here. I think that Judge Brown, I will tell you that I don't know what Judge Malazzo was doing in that sentence. I don't know. Judge Brown didn't do that. Judge Brown made a determination that the use was of what was requested. He did not make findings that there was other use. He made findings that there were discussions. He made findings that you had to have a demobilization plan. He made findings that the demobilization plan was in no way, shape, or form of decommissioning. He made findings that the alleged services provided by neighbors didn't rise to the level of an administrative expense. And I think the reason is that there was some evidence in the record that some services were provided and the debtor used them. But if we look at the evidence in the record, it was about vows being turned. It was about we did some work on the production facility, but the problem is the debtor testimony was we don't know about any vows being turned. They didn't have authority to be in the production facility, and they had no wherewithal to perform these services. So while there is evidence, it's very weak and it's very mild. It was rebutted, and I think it's perfectly clear that Judge Brown said, I don't believe it. What about the daily sheets in the morning? What about the sheets they'd go out in the morning and say, okay, here's the plan of operation today. They would do what they said they would do, and they were signed on. If you look at those, Your Honor, and there's testimony about those data sheets as well, the data sheets run a span from the time where we paid for services, the temporary abandonment of the well, to the time where they worked down to one person other than a supervisor and kind of a person who walked around a, quote, tool pusher. But what you will see is they provided what they were going to do. And the debtor operators, the debtors operating the platform, there's no doubt about that, but the services they provided were on their rig. They were not on our platform and not on our production facilities, and if you look at the bulk of the time period, the daily reports show one person waiting. Okay? You're waiting. But that was incidental, and I think the bankruptcy court made this conclusion, that that was incidental to the fact that neighbors' property was on the platform. They had to take care of their own property. We were not taking care of their property. You just said a minute ago, you said that Judge Brown said, I don't believe it, that there was other use. So where did he — I did not say that. I'm sorry if I gave that impression. I did not say that Judge Brown said he didn't believe it. But Judge Brown made factual findings, and it's perfectly clear to me that there was a total basis for him not to believe it. Okay, but that's — he writes that I'll compensate what you requested, but not use that wasn't requested. Now you say — let me finish. Now you say what he really did was he didn't believe there was other use, and we can't explain Judge Malazzo's statement that there was. What's your answer? My answer is that I read Judge Brown's opinion to be not that. They provided services for our use that was beneficial to the estate. I read his opinion as saying that the services they provided that were beneficial to the estate were those that we requested. It's apples and oranges. I don't think he made the ruling that there were services and equipment and things used that would otherwise be an administrative expense, except that we didn't ask for it. I don't believe that's in his ruling. That's why I don't understand Judge Malazzo's sentence. Okay. Because I think the only thing I can think is that Judge Malazzo was trying to thread a needle. Did we use their services that they had to provide for their own equipment through the daily reports? Because the daily reports are limited to what they're doing on their cranes and on their equipment. And what they're doing for us on their cranes is what we ask them to do. And we got a statement. That's in the record. We got overtime. If it caused overtime, that's in the record. And that's what we calculated our obligation upon. It was separately carved out, separately billed for. And yet what we're hearing today is, and what we've heard throughout, is that because the rig was there, the day rate applies because that's the value of the services provided to the estate. Well, I read Mark Panhurst's full testimony in your strong cross, and that was testy, but he didn't say it's just because we're there. He said it was every single day he confirmed full use. My question to you then is, can you point me, since you did the cross-examination, to where you impeached him on his statement that it was constant use in consultation with your client? I think the testimony of Robert Wichert, he just said what he said. He said what he said. We say it was constant use. They also said we turned vowels. Our people never heard of it. They never saw it. We worked on production. They never heard of it. They never saw it. Robert Wichert's testimony, in my recollection, is that they gave us their reports and we approved them, but their reports were about the use of the rig. And I don't know how to get away from that, because when we needed something because we had no cranes, we used the cranes. And we had no operator. We couldn't operate their cranes. They provided the operator for the cranes. But they had the person on there, and the person was waiting for the most of the time until we got to demobilization when they started working under their contractual obligation to demobilize. What we have is use, but it's of their property. And that's something that I think is missing, because when we look at Transamerica, that's a post-petition sale of pipe to a debtor in possession. And the only argument was I don't owe it because you sold me defective pipe. And the court made a finding and a conclusion that you used 50 million feet of pipe, and some of it might have been defective. But the fact that you sold pipe to a debtor in possession is a post-petition contract that generates a use of our property and a transaction that causes a benefit to the estate. But an unrequested use that allows the estate to have a continuing $2 million a month, you're saying the law doesn't make that a priority? I don't — that's — the concern, Your Honor, is that the uncontested use had not — Unrequested, I said. Oh, I'm sorry. That's true. The earring. Does — under the law — The unrequested use had nothing to do with production. The production was the production. It had nothing to do with the rig. The well that the rig was on the platform to drill was temporarily abandoned in June of 2016 by order of Bessey. They did it. We paid for it. That was it. They did an investigation. They took the choke manifold off, took a chipping tool away. That was the preservation order. The preservation order imposed upon neighbors that it take property off the rig and store it for purposes of further investigation, and told us to hold documents that we had to hold in connection with our operation of the platform. So the — I want the court to understand that the rig had nothing to do with us producing oil and gas. Okay. That was separate. The rig was dead, except they wanted to use it again once they got rid of it, once they got off the platform. And we have testimony in the record that as of the date of the trial, 0% of this type of rig was being in service. And during the time period we were talking about, 40% of the neighbor's rig fleet was in service, five rigs, two in service, including this one, which was not in service because it had finished its job with the TA proposition. In your brief, twice on page 1931, you say that they got rent-free storage for their equipment. Did Judge Brown ever make a finding of fact as to that? No, sir. Pardon me? That was our — I don't think Judge Brown made a finding that they got rent-free storage. I think his finding was that their storage did not provide a benefit to us. Otherwise, he would have granted an administrative expense based on simply storing their equipment on our property. That's our position, that they got essentially rent-free storage. And they were in no hurry to move the rig. They didn't have anything for it to do. When they moved it, it went to dry dock. So we have a — Transamerica, their best case, involved post-petition sale of pipe, a contract, a transaction. We think that Judge Brown was dealing with the transactional requirement of Jack Wade. He used Jack Wade. We think that Neighbors has misstated the standard used by Judge Brown when it said that Judge Brown's standard is heightened because Judge Brown would require that we agree that we owe it before it would be an administrative expense claim. And they said that a couple or three times in their brief, particularly on page 11. Page 18 of the Court's opinion, the Court finds that, with the exception of the service specifically requested by the debtor in possession during this time and which the debtor in possession agrees that it asked for and agreed to pay for, that's just saying we agree that we owe it. The services provided are akin to Neighbors being available to provide services as opposed to Neighbors actually providing services to the debtor in possession. That's on page 18, second full paragraph, last sentence of that, well, second to last sentence of the paragraph. He goes on. Because the requirement for an administrative priority expense is that the creditor provide the debtor in possession with actual and necessary services that benefit the estate, that the services were induced somehow by the debtor in possession, the Court finds that Neighbors did not prove at trial that it provided services from June 20 to October 20 such that it was entitled to receive administrative priority at its day rate during that period. That, to me, Your Honors, says the Court handled everything. And it says that what they provided is what we asked for. Not that they provided things other than we asked for but we don't owe it because we didn't ask for it. I think there's a difference between what the Bankruptcy Court concluded and that's why I've just got to be frank. I don't understand the sentence in Judge Malazzo's opinion because unless you talk. If you don't and we don't, shouldn't we send it back to ask him what he meant? We think it's harmless, Your Honor. We don't think she was carving out a standard that says that no matter what you use, if you don't ask for it, I think she was trying to thread a needle. It's very easy for me to say and to say, and I believe this, that there was evidence. The Neighbors people got up and talked about things they did. Unfortunately, the evidence was refuted and the judge made a finding. He didn't make detailed findings of fact, conclusions of law with respect to each and every allegation of what Neighbors did, but he made a finding that the supposed activities that helped our production that they say we used, we didn't. Otherwise, I think he would have given us an administrative expense because they said we went and turned vows. Our people said there was no turning vows. They couldn't even get down there. We helped in the production arena. They were not involved in the production arena, couldn't get involved and couldn't go down there. That would have been a safety violation. There's plenty of testimony about that. So we never knew where that was coming from, and we don't think the judge knew about it either. Maybe that's what Judge Malazzo was saying. Maybe she was trying to thread the needle between services that, quote, were used because they were part of the safety program on the platform and because Neighbors was on the platform, it had to do it. Counsel, your time has expired. Okay. Thank you, Your Honors. I appreciate it very much. No better. Thanks. Thank you. Please, the Court. I would like to first address this notion that Exhibit 66 represents only what Whistler requested. I'm going to point the Court to the record starting at page 2561 and going through 2565. That is the testimony of Robert Wichert, the Whistler CEO, specifically about Trial Exhibit 66. And what he says is, this is a summary of the amounts that we've agreed that we owe to Neighbors. And then he's asked, where did you come up with the amounts? And he says, we used either rates that were spelled out in the addendums to the contract or the invoices we received from Neighbors. That's the testimony about Exhibit 66. But really, my argument isn't about whether the judge was correct or incorrect, as a matter of fact, about what Whistler requested. What I'm saying is the administrative claim standard does not require that each separate service and each separate piece of equipment be requested by the debtor. But if the use was just scintillas, just turning valves in one person in the morning, and essentially what that means is the functional equivalent of Judge Brown saying, I don't believe your claim that anything else was used other than what I compensated you for, then you wouldn't have a claim, right? I disagree, and here's why. Number one, there's never less than three men, three to ten men on the platform from Neighbors during the relevant four-month period from June 20 to October 20, and that's in the stipulated IEDC reports. And if they're performing maintenance on Neighbors Rig, that is a benefit. Neighbors Rig, Neighbors Equipment, generators, compressors, crane, it's all covered by Mr. Bourne and Mr. Pippin. That's a benefit, though, to Whistler for two independent reasons. One, because there's a regulatory obligation to the CFRs that all of the equipment, and you've got the picture of it, all that equipment on that offshore platform has to be regularly maintained by properly trained personnel. And Mr. Bourne testified, if you don't maintain this equipment in this saltwater environment, you don't keep these bolts lubed and you don't do all these things, then you're going to end up with things that get stuck, and that's logical, and then you're going to have to cut them off, and then you're going to have to shut in production. So Whistler unquestionably benefited from the equipment being maintained on that offshore platform. And in terms of the actual use of items beyond just the East Crane, the West Crane, the MOAB and DMOAB crane, and the two quarters and the additional laborers, not only is it uncontroverted in the record that there was additional use of things like the compressors, the generators, other quarters besides just those two quarters, the electricity that was needed to power those two quarters, but the district court made that finding, made that finding. So you think she got it just right. The sentence is exactly what happened. It is exact. Yes, that is exactly what happened. And I want to talk for a minute about Would you get money if they hadn't used things, but Apollo Group in the far distant up was saying, we need you to stay because we're still hoping to be able to get back to that well. Absolutely. You would get money even though you do nothing because you're being asked to sort of hold in place and you've got to keep all the things lubricated. Yes is the answer. Now, the way I'm actually understanding the question, it's not do we do nothing at all, but are certain items not being used. But even if your question was if you do nothing at all, and I want to point the Court to the Kimsey case. And this is interesting because you have during the same time frame a bankruptcy court and a district court in the Western District of Louisiana making a decision in the Kimsey case, which is in direct conflict with this case. Because in Kimsey, the court is saying, well, there's two divergent lines of cases. One says you need to show actual use in order to have an administrative claim. And the other says if the debtor just makes a business decision that it will benefit from retaining this equipment, whether it uses it or not, that alone will entitle the creditor to an administrative claim. And the reason it's in direct conflict is because that court awarded the administrative claim without regard to actual use. Here you've got you do have evidence of actual use, but you have the court imposing yet one more requirement, which says in addition to evidence of actual use, you have to show evidence that there was a specific request for that use. And so that is a significant problem. And there was no free storage of the rig at any time. Everything is part and parcel. And you can't demobilize part of it without all of it. So the part they needed that they admit they were requesting necessarily required that the entirety of the equipment stay on the platform, and Whistler controlled when the property could be demobilized from the platform. Thank you, counsel. Thank you. That will conclude the arguments of this panel for the week. All the cases are under submission. Thank you.